UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TERESA WATSON,

    Plaintiff,

v.

J.C. PENNEY,

    Defendant.

Case No. 24-cv-1636-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on the motion of defendant JCPenney (incorrectly named in the complaint at J.C. Penney) to dismiss and to compel plaintiff Teresa Watson to pursue her claim in arbitration rather than in court (Doc. 35). Her claim, as set forth in the Amended Complaint (Doc. 11), is a claim under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, for discrimination on the basis of sexual orientation when she was terminated from her employment at the JCPenney salon in Fairview Heights, Illinois. Watson responded to the motion to compel arbitration (Doc. 41), and JCPenney replied to that response (Doc. 43). She also filed another document that has been docketed as a response to various filings (Docs. 47, 48, & 49). In addition, Watson filed a motion for recruitment of counsel (Doc. 40) and motion for change of venue and for a new judge (Doc. 46). The Court addresses the ancillary motions first to pave the way for a ruling concerning arbitration.

**I.**  **Motion for Recruitment of Counsel (Doc. 40)**

In this bare-bones motion, Watson requests an attorney to represent her in this case. Whether to assign an attorney to represent an indigent civil litigant is within the sound discretion of the district court. *Pruitt v. Mote*, 503 F.3d 647, 654 (7th Cir. 2007); *Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992). There is absolutely no right to appointment of

counsel in a civil case. *Pruitt*, 503 F.3d at 656-57. Pursuant to 28 U.S.C. § 1915(e)(1), the Court may request the assistance of counsel in an appropriate civil case where a litigant is proceeding *in forma pauperis*. *Mallard v. U.S. District Court*, 490 U.S. 296 (1989); *Pruitt*, 503 F.3d at 649. Local Rules 83.1(j) and 83.8(b) obligate members of the bar of this Court to accept assignments.

In deciding the request for counsel, the Court should ask (1) whether the indigent plaintiff has made a reasonable attempt to obtain counsel or has been effectively precluded from doing so and (2) whether, given the difficulty of the case, the plaintiff appears at that time to be competent to litigate it herself. *Pruitt*, 503 F.3d at 654-55 (citing *Farmer v. Haas*, 990 F.2d 319, 321-22 (7th Cir. 1993)). "[T]he question is whether the difficulty of the case—factually and legally—exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Id.* at 655. In making this inquiry, courts usually consider factors such as the plaintiff's literacy, communication skills, educational level, litigation experience, intellectual capacity and psychological history. *Id.* Regardless of the *Pruitt* factors, the Court need not appoint counsel where there is no reasonable likelihood that the presence of counsel would alter the outcome of the case. *Id.* at 660.

The Court has serious doubts about whether Watson has the ability to litigate this case competently herself. Often her filings are nearly indecipherable, and she has demonstrated an inability to accomplish the simplest litigation tasks before her like service of her filings. However, Watson has not demonstrated that she has made reasonable attempts to retain counsel and has not shown that she was effectively precluded from making a diligent effort in this regard. Furthermore, as explained below, the current issue before the Court is relatively straightforward, and there is no reasonable chance that the presence of counsel would make a difference in the outcome of that issue. The Court must conserve its attorney volunteers for cases where their

presence is needed to advance a potentially meritorious cause.  Watson's case is not that cause.  For these reasons, the Court will deny her motion for recruitment of counsel (Doc. 40).

**II.      Motion to Transfer Venue and Substitute Judge (Doc. 46)**

In this motion, Watson asks to have all of the in-court proceedings in this case occur at the East St. Louis courthouse instead of the Benton courthouse, where the undersigned judge sits.  Holding court proceedings in Benton would be a hardship for Watson because of the distance from her home.  She also suggests she would like a change of judge.

Unlike litigants in Illinois state courts, federal court litigants are not allowed a change of judge as a matter of right.  *See* 735 ILCS 5/2-1001(a)(2)(i) ("Each party shall be entitled to one substitution of judge without cause as a matter of right.").  In federal court, a judge may recuse him- or herself for various reasons, as the Court has explained to Watson in an October 7, 2025, order (Doc. 30).  *See* 28 U.S.C. §§ 144 & 455.  She asserts none of those reasons here.  There is no legitimate basis to change the judge in this case.

Additionally, in light of the Court's order compelling Watson to arbitrate her claims, as explained below, there is no need to consider the location of future court hearings (Doc. 46).

**III.     Motion to Dismiss and Compel Arbitration (Doc. 35)**

JCPenney asks the Court to enforce an arbitration agreement—the Binding Arbitration and Class Action, Collective Action, and Representative Claim Waiver Agreement ("Agreement")—that Watson signed on April 6, 2023, and to dismiss this case for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3).  Watson argues that she abided by the Agreement by filing a charge with the Equal Employment Opportunity Commission ("EEOC"), which the Agreement allowed her to do.  She further suggests she should not be bound to the Agreement because of the environment in which she was presented with the

3

Agreement. Finally, she questions the validity of the sworn declaration of Angelique Ponse that JCPenney submitted in support of its motion. She raises various other arguments in her effort to continue litigating in court.

As a preliminary matter, the Court will consider Ponce's sworn declaration as competent evidence of the facts of which Ponce has personal knowledge or is otherwise competent to testify. It is of no matter that she herself may not have prepared the declaration and did not, in the content of the declaration, explain her input, if any, into the crafting of the declaration. So long as a witness swears under penalty of perjury to facts that would be admissible in Court, the Court will consider the declaration as evidence. Ponce's declaration passes the test, so the Court will consider it.

The Court also declines to consider the brief Watson filed after JCPenney's reply brief. Such briefs are known as "sur-reply" briefs and are not accepted in any circumstances. *See* SDIL-LR 7.1(a)(4).[1]

A.    Background

Watson was a stylist at the salon at JCPenney in Fairview Heights, Illinois, starting in late February/early March 2023. She is heterosexual. She was terminated after, in a staff inclusion and diversity training on November 7, 2023, she announced that she was "openly heterosexual" and provided information to clarify others' comments or confusion that she thought needed clarification. She did this in an effort to improve the "vibes" she felt in the salon. She also spoke about sexual sins.

---

[1] The Court is aware that Watson's response brief likely violates the 20-page limit on response briefs. *See* SDIL-LR 7.1(a)(3). However, that limit is exclusive of statements of facts. Watson's statement of facts is interspersed with her arguments in a way that would be impossible to determine the exact length of her brief excluding the facts. The Court therefore considers all of it.

On November 10, 2023, Lisa Lewis, the salon supervisor, and Julie Briddell, another JCPenney supervisor, met with Watson.  They displayed a misunderstanding of her comments at the training.  Lewis had an exaggerated response to Watson's one-time use of the word "queer" in the training and noted that Lewis and others were offended by the word.  Briddell criticized Watson for sharing that she was openly heterosexual when she volunteered that information in good faith.  Later that day, Briddell informed Watson by phone that she had been terminated.  She never received written notice of her termination.

Watson filed this lawsuit in July 2024.  Her original Complaint alleged causes of action for discrimination on the basis of sex in the form of sexual harassment and retaliation.  However, her Amended Complaint failed to plead those claims and instead plausibly suggested only a claim for sexual orientation discrimination.

JCPenney believes this dispute is subject to mandatory arbitration based on the Agreement, which Watson signed when she started working for JCPenney.  The Agreement provides, in pertinent part,

> Under the Agreement, and subject to certain exceptions specified in this Agreement, all employment-related disputes between you and JCPenney that are not resolved informally will be resolved by binding arbitration in accordance with the terms set forth below.  The disputes that will be subject to arbitration are defined below and are referred to in this Agreement as "Arbitrable Claims."  This Agreement applies to Arbitrable Claims, whether raised by you or JCPenney. If you do not timely opt out of the Agreement in the manner described below, you and JCPenney mutually agree to be bound by this Agreement's terms and to resolve all Arbitrable Claims through mandatory, final, and binding individual arbitration, instead of through litigation in court. This means that if you do not timely opt out of the Agreement, mandatory arbitration is your and JCPenney's sole and exclusive means of resolving Arbitrable Claims, and both you and JCPenney are explicitly waiving the right to a jury trial or bench trial on any Arbitrable Claims.

Agreement 1 (Doc. 36-1).   The period to opt out expires 21 calendar days after the employee signs the agreement.  *Id.*  The Agreement states in bold, all capital letters, and underlined:

"**YOUR DECISION TO PARTICIPATE OR NOT PARTICIPATE IN THE PROGRAM WILL HAVE NO EFFECT ON YOUR EMPLOYMENT WITH JCPENNEY**." *Id.* The remaining nine pages of the Agreement spell out the details, including the scope of its coverage:

> Arbitrable Claim means any past, present or future claim, controversy, or dispute arising out of, or related to, your past, present, or future employment, application for employment or termination from employment with JCPenney, but only if a court would be authorized by law to grant relief if the claim were successful and not including any of the "Excluded Claims" described below.

*Id.* at 2. It gives as an example of an Arbitrable Claim a claim for wrongful termination or unlawful discrimination, and it lists Excluded Claims, none of which apply in this case. *Id.* at 2-3. The Agreement provides that American Arbitration Association Employment Arbitration Rules apply.

Watson electronically signed the Agreement on April 6, 2023, and did not opt out within twenty-one days thereafter.

  B.  <u>Arbitration Standard</u>

The arbitration agreement in this case is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. The FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *accord Perry v. Thomas*, 482 U.S. 483, 488 (1987).

The FAA provides that "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable. . . ." 9 U.S.C. § 2; *see Buckeye*

*Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443-44 (2006); *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone*, 460 U.S. at 24-25; *accord Cnty. of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 823 (7th Cir. 2006). Nevertheless, the Court must remember that the intentions of the parties in entering an arbitration agreement trump the FAA's pro-arbitration policy, and a party cannot be compelled to arbitrate a dispute it did not agree to submit to arbitration. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995); *see Druco Rests., Inc. v. Steak N Shake Enters.*, 765 F.3d 776, 782 (7th Cir. 2014); *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d 682, 687 (7th Cir. 2005).

"A party seeking to compel arbitration under the FAA must show three elements: (1) an enforceable written agreement to arbitrate; (2) a dispute within the scope of the arbitration agreement; and (3) a refusal to arbitrate." *Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 617-18 (7th Cir. 2024) (citing *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018)).

    C.    <u>Application</u>

JCPenney has established that the Court should compel arbitration of the only claim Watson has pleaded in this case, a claim of unlawful discrimination on the basis of sexual orientation when it terminated her. It has established a valid, enforceable agreement to arbitrate, a dispute that falls within the broad scope of that Agreement, and Watson's refusal to submit that dispute to arbitration.

1. <u>Valid, Enforceable Agreement</u>

Watson makes several suggestions that the Agreement is not valid or enforceable. Whether a dispute is subject to arbitration pursuant to valid arbitration agreement is a gateway issue that should be decided by the Court. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83-84 (2002). Questions of arbitrability generally include whether a specific party is bound by an arbitration clause, whether the clause applied to a certain kind of dispute, *id.* at 84, and whether a contract was actually formed and is enforceable, *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299-300 (2010). Courts apply state contract law when determining whether there is a valid agreement to arbitrate. *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005). Under Illinois law, "an offer, an acceptance and consideration are the basic ingredients of a contract." *Melena v. Anheuser-Busch, Inc.,* 847 N.E.2d 99, 109 (Ill. 2006) (citing *Steinberg v. Chi. Med. Sch.*, 371 N.E.2d 634, 639 (Ill. 1977)).

Watson does not contest that JCPenney offered to enter into a mutually binding agreement to arbitrate on April 6, 2023. She hints that her acceptance, as evidenced by her electronic signature, was not valid because she did not read or understand the Agreement when JCPenney offered it. She was presented with the agreement by a JCPenney employee who was not pleased he had to substitute for Briddell in the meeting with Watson, and Watson clearly knew he did not want to be there. Further, she was not comfortable with his sexuality; she noted that "he was not the most masculine man," and "his sexual identity expressions influenced the atmosphere." Pl.'s Resp. M. Compel 3 (Doc. 41). Watson wanted to leave quickly and did not want to take the time to read the Agreement presented to her, so she just signed it, acknowledging that she had read the Agreement, understood it, and agreed to be bound unless

8

she opted out. She continued to come to work at JCPenney and failed to take advantage of the opportunity to opt out of the Agreement by submitting an opt-out form.

The circumstances do not suggest any procedural unfairness in the manner of executing the Agreement. An agreement may be invalid because of procedural unconscionability "where a term is so difficult to find, read, or understand that the plaintiff cannot fairly be said to have been aware he was agreeing to it, and [procedural unconscionability] also takes into account a lack of bargaining power." *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 622 (Ill. 2006). Nothing in Watson's situation suggests the terms of the Agreement were hard to find, read, or understand. Further, she had equal power to refuse the Agreement without endangering her employment by simply filing the opt-out form. Watson's discomfort with the JCPenney representative and her desire to end the encounter as quickly as possible do not render the procedures unfair. This is especially true where she had twenty-one days after the encounter to back out of the Agreement simply by submitting a form.

Her signature and her conduct indicated acceptance of the agreement. And the law is clear that an agreement is effective even if a signing party fails to read it. "A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome." *Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997). Watson's failure to read the Agreement at the time she signed it does not render her acceptance invalid.

It is also clear that the Agreement was supported by consideration on both sides. It binds both parties to arbitrate disputes with each other. It further places limits on JCPenney's ability to modify the Agreement. These provisions show that the Agreement is not illusory and is supported by mutual consideration.[2]

---

[2] Watson may have argued that the Agreement is unenforceable under the Ending Forced

JCPenney has demonstrated that the Agreement was a valid, enforceable agreement.

### 2. Within Scope of Agreement

The Agreement has a broad scope, covering "all employment-related disputes" with certain exceptions that do not apply. This dispute, a claim of termination based on Watson's sexual orientation, falls squarely within the scope of the arbitration clause.

Watson's decision to file a charge of employment discrimination with the EEOC, as permitted by the Agreement, does not remove her dispute from the broad scope of the Agreement. Indeed, JCPenney is not asserting that she wrongfully filed an EEOC charge but that she filed a lawsuit under circumstances where she had contractually agreed not to do so. The Agreement is clear on that: "[I]f such an agency completes its processing of your claim, and you thereafter choose to pursue the claim further, you must do so only under this Agreement," Agreement 3, that is, by resort to Arbitration.

### 3. Refusal to Arbitrate

Finally, it is clear by Watson's conduct and words that she is intransigent in her pursuit of this litigation and refuses to arbitrate this dispute pursuant to the Agreement.

JCPenney having established the three requirements for an order to compel arbitration, the Court will grant its motion to compel arbitration. The Court turns now to the question

---

Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), 9 U.S.C. § 402(a), which declares invalid and unenforceable any predispute agreement to arbitrate a federal case that relates to conduct constituting a sexual harassment dispute. While this case originated as a sexual harassment claim, the Amended Complaint (Doc. 11) does not plead sufficient facts to plausible suggest a right to relief for such a cause of action (Doc. 15). Although she pleads the label "sexual harassment" in the Amended Complaint, Watson has pled no viable sexual harassment claim therein. In fact, her excessive pleading of facts in the Amended Complaint reveals that the sexual harassment claim identified in her original Complaint was the product of conclusory assertions rather than a legitimate factual basis. Accordingly, the EFAA will not render the Agreement invalid or unenforceable.

whether to stay or dismiss this case while an arbitration is held.

D.     Stay or Dismissal

The FAA commands a federal court, on the request of one of the parties, to stay proceedings where (1) the issue is "referable to arbitration under an agreement in writing for such arbitration," and (2) "the applicant for the stay is not in default in proceeding with such arbitration."  9 U.S.C. § 3; *see Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991).  The stay shall last "until such arbitration has been had in accordance with the terms of the agreement. . . ."  9 U.S.C. § 3; *accord Halim v. Great Gatsby's Auction Gallery, Inc.*, 516 F.3d 557, 561 (7th Cir. 2008).  The Court of Appeals for the Seventh Circuit has interpreted *Smith* and § 3 of the FAA to require a stay "only when one of the parties has requested such a stay."  *Nat'l Cas. Co. v. Cont'l Ins. Co.*, 121 F.4th 1151, 1153 (7th Cir. 2024).  Otherwise, the district court may dismiss the action.  *Id.*

Watson has not asked the Court to stay this case instead of dismissing it, and JCPenney has asked for a stay only as an alternative should the Court refuse to dismiss the case.  Watson's arguments solely address whether the Court should allow this court case to continue as an active court case or dismiss it.  Therefore, the condition set forth in § 3 that a party request a stay has not been met.

Dismissal is not appropriate under Rule 12(b)(3).  A forum selection clause like an arbitration agreement does not render venue improper.  *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013); *Rodgers-Rouzier v. Am. Queen Steamboat Operating Co., LLC*, 104 F.4th 978, 984 (7th Cir. 2024).  "Common-law doctrines like *forum non conveniens* are the preferred mechanism by which to dismiss a suit brought in the wrong forum, if it cannot be transferred to the right one."  *Rodgers-Rouzier*, 104 F.4th at 984 (citing *Atl.*

11

*Marine*, 571 U.S. at 60). The Court will therefore exercise its discretion to dismiss this case without prejudice for *forum non conveniens* so the parties can arbitrate their dispute in the venue selected in the Agreement. *See, e.g., Comer v. Hagerty, Inc.*, No. 24-CV-0468-BHL, 2025 WL 18657, at *4 (E.D. Wis. Jan. 2, 2025).

**IV.   Conclusion**

For the foregoing reasons, the Court:

- **DENIES** Watson's motion for recruitment of counsel (Doc. 40);
- **DENIES** Watson's motion to transfer venue and substitute judge (Doc. 46);
- **GRANTS** JCPenney's motion to dismiss and compel arbitration (Doc. 35);
- **DISMISSES** this case **without prejudice** on the grounds of *forum non conveniens*; and
- **DIRECTS** the Clerk of Court to enter judgment accordingly.

If any party wishes to appeal this decision, generally they must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(1)(A). A motion under Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline. Fed. R. App. P. 4(a)(4). A Rule 59(e) motion must be filed no more than 28 days after the entry of the judgment, and this 28-day deadline cannot be extended. Other motions, including a Rule 60 motion for relief from judgment, do not toll the deadline for an appeal.

The fee to file a notice of appeal is $605.00. If Watson files a motion for leave to appeal *in forma pauperis* (to proceed without prepayment of fees), she must include in her motion a statement of her finances as well as a description of the issues she intends to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If her motion is denied by this Court, within 30 days after service of this Court's denial of her motion, she may reapply to the Court of Appeals for leave to

proceed *in forma pauperis*. Fed. R. App. P. 24(a)(5). If she is not allowed by either Court to proceed *in forma pauperis*, she will be liable for the full $605.00 appellate filing fee.

**IT IS SO ORDERED.**
**DATED:  January 29, 2026**

                                           s/ J. Phil Gilbert
                                           **J. PHIL GILBERT**
                                           **DISTRICT JUDGE**